**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**District Judge Robert E. Blackburn**

Civil Action No. 12-cv-00678-REB

ABRAHAM HAGOS,

      Petitioner,

v.

TOM CLEMENTS, Executive Director, Colorado Department of Corrections, and
JAMES FALK, Warden, Sterling Correction Facility, and
JOHN SUTHERS, Attorney General of the State of Colorado,

      Respondents.

---

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

---

**Blackburn, J.**

      This matter is before me on the **Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** ("Petition") [#1][1] filed on March 16, 2012, by Petitioner Abraham Hagos.  Respondents have filed an Answer [#7], and Petitioner has filed a Reply [#8].

      After reviewing the pertinent portions of the record in this case, including the Petition, the Answer, the Reply, and the state court record [#10], and the applicable law, I conclude that the Petition should be denied.

## I.  Background[2]

---

[1][# ] is an example of the convention I use to identify the docket number assigned to a specific paper by the Court's electronic case filing and management system (CM/ECF).  I use this convention throughout this order.

[2]The factual background of this case is taken from both the Colorado Court of Appeals' (CCA's) opinion, **People v. Hagos**, No. 05CA2296, 250 P.3d 596, 606-07 (Colo. App. Oct. 29,  2009), and the state court record.

Abraham Hagos ("Hagos" or "Petitioner") and Jimmy Roberts ("Roberts") were involved together in the sale and distribution of drugs.  During execution of a search warrant for Robert's residence in Jefferson County, Colorado, police seized a safe containing over $7,000 in cash, quantities of cocaine and methamphetamine, and a gun.  Roberts subsequently cooperated with police and implicated Hagos.  Robert's cooperation extended to giving testimony at a preliminary hearing in a drug case against Hagos initiated in Jefferson County.

Hagos determined to have Roberts killed and sought assistance to do so from numerous persons, including Matthew Conner ("Connor"), a friend and coworker of Roberts, and members of an ethnic Cambodian gang.  Hagos offered to pay $10,000 for the killing.  One gang member, Kosal So ("Kosal"), accepted the money and agreed to kill Roberts.  Following additional discussions, Hagos agreed to pay Kosal an additional $10,000 and provided a gun that Kosal and another gang member, Samnang Prim ("Prim"), could use to commit the crime.  Kosal also solicited the assistance of another gang member, Phetsomphone Chanthaphom ("Ley").

On November 4, 1998, the day before a motions hearing in the Jefferson County drug case, Kosal took Prim and Ley to a location near Robert's residence.  Roberts, who had been invited by Conner to go out with him that evening to facilitate the opportunity for the killing, observed the men at a bus stop, and after Roberts climbed into Conner's car, shots were fired at Roberts who returned fire.  No one was hit by the gunfire.

The next day, Roberts went to court for the motions hearing and, while waiting in a room near the courtroom, he observed Hagos come to the window of the waiting room

and make a gesture to Roberts pretending to shoot a gun to the head.  Roberts reported the gesture to the prosecutor.

Two days later, on November 7, 1998, Kosal picked up Prim and drove him to Robert's workplace.  Prim ran to where Roberts was preparing to park his car and fired multiple shots into the car, killing Roberts.  After confirming Robert's death, Hagos paid Kosal the remaining $10,000, $5,000 of which Kosal paid to Prim.

Police repeatedly interviewed Connor following Robert's death, and on November 17, 1998, Connor implicated himself and Hagos in a plot to kill Roberts. Police eventually matched shell casings from the murder scene to a gun used in the November 4, 1998, shootout and from a shooting in September of the same year.  They ultimately linked the gun to Kosal.  Kosal confessed his involvement in the November 4 and 7 shootings, pled guilty to second degree murder and agreed to testify against Hagos.

Kosal informed police that Hagos hired him to kill Roberts.  Kosal identified Prim and Ley as having been involved in the November 4, 1998, shooting and identified Prim as the lone gunman in Robert's death.  Police arrested Prim who confessed to killing Roberts on November 7 and to his involvement in the November 4 shootout.  He detailed his involvement in both episodes to police and provided handwritten diagrams of the November 7 crime scene.

On July 15, 1999, a grand jury found probable cause to indict Hagos on counts of first degree murder - after deliberation, attempted first degree murder, conspiracy to commit first degree murder and two-counts of witness retaliation.[3]  The trial court

---

[3]Specifically, the State of Colorado charged Hagos in a five count indictment as follows:  Count 1, Murder 1-After Deliberation (C.R.S. 18-3-102(1)(a)); Count 2, Murder 1-After Deliberation-ATT (C.R.S. 18-3-102(1)(a)); Count 3, Murder 1-After Deliberation-CSP (C.R.S. 18-3-102(1)(a)); Count 4, Retaliation Against Victim/Witness (C.R.S. 18-8-706) [November 4, 1998 incident]; and Count 5 Retaliation Against

appointed the Office of the State Public Defender ("PD") and attorney Fernando Freyre ("Freyre") to represent Hagos.

## A.    Disqualification of Hagos's Trial Counsel

During pretrial proceedings, defense counsel learned that Hagos might have admitted his role in the killing to fellow inmate Robert Newton ("Newton") during a jailhouse conversation.  Freyre and an investigator then interviewed Newton's wife, Patricia Newton, on April 7, 2000, to determine if she might be able to impeach Newton's testimony.  The following day, Freyre met with Patricia Newton alone to interview her again.  Following that meeting, Patricia Newton told prosecutors that Freyre had threatened her during the interview.  The next day, the prosecution moved to disqualify Freyre and the PD from the case.

The trial court held multiple hearings on the disqualification motion.  During one of the hearings, Patricia Newton reported seeing Hagos silently mouth the phrase, "you're dead" to her from the defense table.  No one else observed Hagos threaten Patricia Newton.  On September 21, 2000, the trial court ruled that Freyre had created a conflict of interest by interviewing Patricia Newton alone, making himself a witness in the case.  Although Hagos wanted Freyre to stay on the case, Hagos rejected the trial court's proffered solution to commit to not calling Patricia Newton at trial as a condition of keeping Freyre as his attorney of record.  Thereafter, the trial court disqualified Freyre and the PD office and appointed the Alternate Defense Counsel to represent Hagos.

## B.    Denial of Motion to Suppress Evidence

---

Victim/Witness (C.R.S. 18-8-706) [November 7, 1998 incident].

4

On February 13, 2002, the prosecution filed an offer of proof regarding evidence it wished to present to the jury as either *res gestae* or other acts evidence under Colorado Rule of Evidence (CRE) 404(b).  The motion noted that there had been two searches of the apartment based upon two separate warrants.  Specifically, the prosecution sought permission to introduce evidence related to the seizure of drugs from Roberts's apartment at 7389 Grant Ranch.  The trial court granted in part and denied in part that motion.  In analyzing the prosecution's request to introduce the evidence as *res gestae* of Hagos's intimidation and murder of Roberts, the trial court explained:

> The theory of the People's case is that James Roberts was killed to prevent him from testifying in the Jefferson County case. Therefore the Jefferson County case against Mr. Hagos is a part of the *res gestae* and necessary for the jury's understanding.  The jury will need to know enough about the Jefferson County case to put the actions in context.  The Court will allow evidence showing that there was such a case and what the charges were in Jefferson County. [ ] The Court will allow brief testimony showing the location searched which disclosed the drugs which were the subject of the case.  All of this material, of course, will be allowed only with an accompanying limiting instruction from the Court explaining that Mr. Hagos is not on trial for that charge and that this evidence is being introduced only to place into context the evidence which is presented in the present trial.

Order of Mar. 13, 2002, p. 4.  After the trial court granted the prosecution's motion, Hagos filed a "Motion to Suppress Evidence Seized Pursuant to Search Warrant (176)."  *See* Hagos's mot., p. 1 [BS 1366].  That motion challenged the validity of the search warrant issued for the 7389 Grant Ranch property.  Following oral argument on March 28, 2002, the trial court declined to determine Hagos's motion on the merits, reasoning that evidence concerning the search was admissible as res gestae in the present case.  Tr. of Mar. 28, 2002, p. 42.  The trial court stated:

... the evidence which I'm allowing to be presented, is being allowed to be presented because this was what was anticipated to be the evidence at that trial. The motion to suppress had been denied and this evidence was anticipated to be presented to a jury in making that determination.

It was not. There was no appeal. There was no jury verdict, but this is what everyone expected was going to be presented, and that is the res gestae in this case. Whether that was correct or would have been sustained on appeal, I don't know, but this is what everyone, including Mr. Hagos, was aware was going to be the evidence in the case.

And so because that is that res gestae of this case, I'm allowing it, but I like your argument.

*Id.* at pp. 41-42.

## C.   Testimony of Detective Joel Humphrey

The trial began on April 17, 2002.  Because Prim asserted his Fifth Amendment rights when called to testify, the prosecution sought to introduce Prim's confession to his role in the November 4 and 7 shootings through Detective Joel Humphrey ("Detective Humphrey").  On April 23, 2002, prosecutors called Detective Humphrey to testify about his investigation into Robert's death.  Whether and to what extent Detective Humphrey would be allowed to testify about Prim's confession was a contested issue.  Immediately before the prosecution called him to the stand, the trial court judge severely limited the information from Prim's confession that Detective Humphrey would be allowed to convey to the jury.

When called to the stand and asked what Prim told him about the night of November 4, 1998, Detective Humphrey testified that:

[Prim] stated that he accompanied Kosal So and Ley to the residence; that Kosal So dropped them off; that he and Ley approached an individual they believed to be Jimmy Roberts; that that individual began shooting at them and they shot back at him; that Ley's pistol misfired; and that Ley

6

eventually collapsed; that they then returned, they, being Ley, Prim and Kosal So, had returned to Aurora.

Tr. of April 23, 2002, p. 171.  Detective Humphrey also relayed that Prim had identified both the weapon he used - a .45 caliber pistol - and the weapon Ley had used - a 9mm pistol - during the November 4, 1998 shooting.  *Id.*

Detective Humphrey also testified as to Prim's confession to the November 7, 1998 murder of Jimmy Roberts:

> [Prim] stated that he and Kosal So traveled to that address and Kosal So dropped him off and that he began walking, but as he was walking, Jimmy Roberts passed him. [Prim] then walked up to where Roberts was stopped -- where Roberts was stopped, and then turning, walked up to the car and began shooting into the car.

*Id.* at p. 172.  He also testified that Prim admitted using the same pistol Ley had used during the November 4, 1998, shooting when he killed Roberts and that he and Kosal So returned to Aurora after the murder.  *Id.*  Hagos's attorney declined to cross-examine Detective Humphrey.  Tr. of April 24, 2002, p. 14.

On April 26, 2002, the jury returned guilty verdicts on all five counts.

## D.    Post-conviction proceedings

On June 14, 2002, a three-judge panel was appointed to hear the penalty phase of the case.  On June 24, 2002, however, the United States Supreme Court announced its decision in *Ring v. Arizona*, 536 U.S. 584 (2002), holding that an Arizona statute allowing for a judge, rather than a jury, to find aggravating factors necessary to impose the death penalty violated the Sixth Amendment.  On August 8, 2003, the trial court issued an order concluding that the prosecution could not seek the death penalty, which

the prosecution appealed to the Colorado Supreme Court.  The Colorado Supreme

Court affirmed that ruling in ***People v. Hagos***, 110 P.3d 1290 (Colo. 2005).

On September 7, 2005, the trial court sentenced Hagos to life in prison without

parole, to be served consecutively to his life sentence in his kidnapping case, Denver

County case no. 00CR3603.[4]  Hagos then directly appealed his convictions.  In a

published opinion, the Colorado Court of Appeals affirmed his convictions, but

remanded the case for a hearing concerning whether the victim's statements were

testimonial, and, if so, whether they were nonetheless admissible under the forfeiture by

wrongdoing doctrine.  ***People v. Hagos***, No. 05CA2296, 250 P.3d 596, 606-07 (Colo.

App. Oct. 29,  2009).  Hagos later withdrew his claims of error subject to remand.  On

September 13, 2010, the Colorado Supreme Court denied Hagos's petition for certiorari,

and, on March 21, 2011, the United States Supreme Court also denied Hagos's petition

for certiorari.

On March 16, 2012, Hagos, represented by counsel, filed the instant Petition.

Hagos asserts the following claims for relief:

1.    "The undisputed confrontation clause violation in admitting the
      shooter's confession was not harmless, and the CCOA's conclusion
      to contrary was unreasonable."  Pet. at 11.

2.    "Petitioner is entitled to habeas relief on his Fourth Amendment
      claim."  Pet. at 29.

3.    "The CCOA's conclusions affirming disqualification of Petitioner's
      counsel-of-choice are contrary to clearly established Supreme
      Court precedent requiring that waivers of counsel be knowing and
      voluntary."  Pet. at 46.

---

[4]Hagos was sentenced to life in prison on Count 1, twenty four  years on Count 2, twenty four
years on Count 3, twelve years on Count 4, and twelve years on Count 5.

4.      "The cumulative effect of the aforementioned constitutional errors
         could not have been harmless."  Pet. at 56.

## II.  Analysis

### A.      Standard of Review

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be

issued with respect to any claim that was adjudicated on the merits in state court,

unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).

I review claims of legal error and mixed questions of law and fact pursuant to 28

U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003).  The

threshold question pursuant to § 2254(d)(1) is whether Petitioner seeks to apply a rule

of law that was clearly established by the Supreme Court at the time his conviction

became final.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  The "review under

§ 2254(d) is limited to the record that was before the state court that adjudicated the

prisoner's claim on the merits."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

"Finality occurs when direct state appeals have been exhausted and a petition for writ of

certiorari from this Court has become time barred or has been disposed of."  *Greene v.*

*Fisher*, 132 S.Ct. 38, 44 (2011) (citing *Griffith v. Kentucky*, 479 U.S. 314, 321, n. 6

(1987).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of my inquiry pursuant to § 2254(d)(1).  *See id.* at 1018.  If a clearly established rule of federal law is implicated, I must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405 (citation omitted).

> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08.  Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply. *Carter* [*v. Ward*], 347 F.3d. [860,] 864 [10th Cir. 2003) (quoting *Valdez* [*v. Ward*, 219 F.3d [1222] 1229-30 [10th Cir. 2000]).

*House*, 527 F.3d at 1018.

My inquiry pursuant to the "unreasonable application" clause is an objective one.

*See Williams*, 529 U.S. at 409-10.  "[A] federal habeas court may not issue the writ

simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly.

Rather that application must also be unreasonable."  *Id.* at 411.  "[A] decision is

'objectively unreasonable' when most reasonable jurists exercising their independent

judgment would conclude the state court misapplied Supreme Court law."  *Maynard*,

468 F.3d at 671.  In addition,

> evaluating whether a rule application was unreasonable requires
> considering the rule's specificity.  The more general the rule, the more
> leeway courts have in reaching outcomes in case-by-case determinations.
> [I]t is not an unreasonable application of clearly established Federal law
> for a state court to decline to apply a specific legal rule that has not been
> squarely established by [the Supreme] Court.

*Harrington v. Richter*, 131 S. Ct. 770, 786,  --- U.S. --- (Jan. 19, 2011) (internal

quotation marks and citation omitted).  I "must determine what arguments or theories

supported or . . . could have supported[ ] the state court's decision" and then "ask

whether it is possible fairminded jurists could disagree that those arguments or theories

are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Id.*  "[E]ven

a strong case for relief does not mean the state court's contrary conclusion was

unreasonable."  *Id.* (citation omitted).  "Section 2254(d) reflects the view that habeas

corpus is a guard against extreme malfunctions in the state criminal justice systems, not

a substitute for ordinary error correction through appeal."  *Id.* (internal quotation marks

and citation omitted).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671.

Furthermore,

> [a]s a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. at 786-87.

## B.   Claim One

Hagos asserts a violation of the Confrontation Clause in his first claim.  He argues that the admission of Prim's confession through a testifying police officer deprived him of his right to cross-examine Prim.  Moreover, he maintains that the Colorado Court of Appeals ("CCOA") unreasonably applied Supreme Court precedents when it concluded that the admission of Prim's confession was harmless beyond a reasonable doubt.  Specifically, Hagos asserts that the CCOA's analysis of the harmlessness factors set forth in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) was flawed.  Pet., p. 12.  As a result, Hagos believes that the CCOA's conclusion was unreasonable because the "trial record makes clear that the unconstitutional admission of Prim's confession had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  Pet., p. 12 (citing *Brecht v. Abrhamson*, 507 U.S. 619 (1993)).

Respondents concede that the introduction of Prim's confession violated Hagos's Confrontation Clause rights, but maintain that the CCOA's conclusion that the error was harmless was reasonable.  They assert that Prim's inculpatory statements taking responsibility as the shooter were cumulative of other statements Prim made that were

properly admitted at trial.   Further, they argue the prosecution's case against Hagos

was "overwhelming and extensive" and built around the testimony of Connor and Kosal,

not Prim.

   In his reply, Hagos emphasizes that the harmless error analysis I must perform

requires more than asking whether there was sufficient support for the verdict in the

absence of the improper testimony.   Rather, Hagos claims that I must determine

whether the error had "substantial influence" on the verdict, and if so, the verdict cannot

stand.   Reply, p. 2 (citing *Kotteakos v. United States,* 328 U.S. 750, 765 (1946)).

Hagos believes that Prim's confession was the glue that held the prosecution's case

together.   It not only reinforced and corroborated Prim's nontestimonial hearsay

statements, but it reinforced and corroborated "everything."   *Id.* at p. 5.   That the

confession came in through a law enforcement officer made its harmful effect all the

more substantial.

   "Confrontation Clause errors[ are] subject to ... harmless-error analysis."   *Van

Arsdall*, 475 U.S. at 684.   In the habeas context, I must take *Brecht* into consideration

as it gives the complexion of the Confrontation Clause harmless-error analysis a

different bent:

> When a federal court considers a Confrontation Clause violation in a
> habeas proceeding, the relevant harmless error analysis is whether,
> assuming that the damaging potential of the cross-examination were fully
> realized, a reviewing court might nonetheless say that the error had
> substantial and injurious effect or influence in determining the jury's
> verdict.   This court's harmless error review is de novo.

*Jones v. Gibson*, 206 F.3d 946, 957 (10th Cir. 2000) (citations omitted) (quoting *Van

Arsdall*, 475 U.S. at 684, and *Brecht*, 507 U.S. at 623, 637–38) (internal quotation

marks omitted).[5]  The question for me is whether admission of the testimony without

"confrontation" substantially affected the jury's verdict.  *Littlejohn v. Trammel*, --- F.3d

---, n.14, 2013 WL 64372 (10th Cir. Jan. 7, 2013).

Whether an error is harmless depends on (1) the importance of the witness'

testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the

presence or absence of evidence corroborating or contradicting the testimony of the

witness on material points; (4) the extent of the actual cross-examination; and (5) the

overall strength of the State's case.  *See Van Arsdall*, 475 U.S. at 684.  In reviewing for

harmless error, I must examine "the entire record to determine the error's possible effect

on the jury."  *Jones*, 206 F.3d at 957.

Only one area of inquiry under *Van Arsdall* suggests the error was not harmless -

the extent of the actual cross-examination.  Prim's confession was admitted through the

testimony of Detective Humphrey.  Nothing that Prim said or did was subject to cross-

examination during Hagos's trial.  This factor therefore favors a finding that the error in

admitting Prim's testimony was not harmless.

The remaining factors, however, all strongly support the conclusion that the error

was harmless.  As to the first factor - the importance of the witness' testimony in the

prosecution's case - Hagos's arguments, while superficially appealing, greatly

exaggerate the importance of Detective Humphrey's testimony at trial.  My review of the

record indicates that the testimony of Kosal and Connor provided the critical evidence

---

[5] *See also Fry v. Pliler*, 551 U.S. 112, 121 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* .... whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard....").

against Hagos.  Hagos facilitated and paid for Robert's murder through telephone calls and in person meetings with Kosal and Connor.  Those two witnesses testified as to their interactions with Hagos, explained how and why Hagos wanted Roberts killed and explained their roles in carrying out Hagos's directives resulting in the death of Roberts. While Prim actually pulled the trigger, he had no contact with Hagos nor did Detective Humphrey's testimony about Prim's confession suggest why Prim participated in the November 4 and 7 shootings.  That testimony came from Kosal and Connor.

Detective Humphrey's testimony was also cumulative of Prim's nontestimonial hearsay statements that were introduced at trial.  By the time Detective Humphrey testified, the jury had already heard substantially similar testimony from Prim through two of his fellow gang members Kosal and Srey Mony ("Srey").  As to the November 4 shooting, Kosal testified that immediately after the shooting:

> [Prim said he] felt like it was a setup. When he got there there was no honking.  Instead of them shooting at those guys, they got shot at instead. .... [Prim] told me he fired his weapon ... [Prim told me] that [Roberts] was shooting at him[.]

Tr. of April 22, 2002, pp. 64-65.

Kosal also testified what Prim told him on the day of the shooting.  After describing how he and Prim drove to Robert's place of work on November 7, Kosal testified that he dropped Prim off and saw him run towards Robert's car.  Kosal then heard gunshots and observed Prim run back towards Kosal's car and dispose of the murder weapon in a nearby dumpster.  Kosal testified that Prim then said that he thinks Roberts is dead and that he saw blood coming out of Robert's mouth. *Id.* at pp. 74-75.

Srey testified that he spoke with Prim after the November 7, 1998, shoot out with Roberts.  Srey testified that Prim told him he "fired two shots into the car.  [Prim was] pretty sure that he hit [Roberts], but he's not positive."  Tr. of April 23, 2002, at p. 16.

Srey also testified about his conversation with Prim following the murder of Roberts on November 7, 1998.  When Srey returned home from work that afternoon he found Prim sitting in the dark in the basement.  Srey testified that Prim said "[I] killed a guy. [I] emptied a whole clip into the car ... and [I've] never seen so much blood before." *Id.* at p. 19.   Thus, the statements attributable to Prim introduced through Detective Humphrey were cumulative of inculpatory statements from Prim the jury had heard from Kosal and Srey.

The next factor - the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points - also supports a finding of harmlessness.  Hagos attempts to identify contradictions in the statements made by Roberts to Jefferson County prosecutor Judy Archuleta and the physical evidence from the crime scene.  Pet., pp. 24-25 [#1].  Hagos's discussion of this contradictory evidence does little to address Detective Humphrey's testimony. Hagos might have strayed from the relevant inquiry because the evidence corroborating Detective Humphrey's testimony was plentiful.  Prim's confession to the detective corroborates Prim's hearsay statements as testified to by Kosal and Srey.  It also corroborates Kosal's observations as the driver of the get away car for both the November 4 and 7 shootings.  It also corroborates Hagos's own admissions as testified to by a number of witnesses.

Finally, considering the overall strength of the prosecution's case, and assuming that the damaging potential of the precluded cross-examination of Prim would have been fully realized, the limited admission of parts of Prim's confession through Detective Humphrey did not have a substantial and injurious effect on the outcome of the trial.  In addition to the testimony discussed above, the prosecution presented a strong case evincing Hagos's premeditated plan to kill Roberts.  Evidence that Hagos threatened Roberts's life is abundant in the record and so is the evidence that he facilitated and paid for his murder.  Hagos's own statements against interest related by testifying witnesses and, coupled with the substantial, detailed testimony of Kosal, reflect the strength of the prosecution's case.

Having balanced the *Van Arsdall* factors, in light of the strong evidence in the record of guilt, I agree with the CCOA that Hagos's inability to cross-examine Prim did not substantially affect or influence the jury's verdict.  *Jones*, 206 F.3d at 957–58.  I further find that, while Hagos's confrontation rights might have been violated, any such violation was harmless.  Accordingly, the CCOA's determination that the Sixth Amendment violation was harmless error was neither contrary to, nor an unreasonable application of, clearly established federal law.  I therefore DENY this claim for habeas relief.

## C.    Claim Two

In his second claim for relief, Hagos argues that the CCOA ruled contrary to clearly established federal constitutional law in holding that the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984) precluded application of the exclusionary rule to the evidence obtained from the apartment located at 7389 Grant

17

Ranch Boulevard.  Pet., pp. 31-32.  Because the affidavit filed in support of the search warrant failed to establish probable cause, Hagos maintains that the good faith exception to the exclusionary rule has no applicability.  The CCOA's opinion finding otherwise is therefore contrary to *Leon.*

The Respondents counter that Hagos is barred from litigating this Fourth Amendment issue because the state courts afforded him a full and fair opportunity to litigate his Fourth Amendment claim.  Resp., p. 38.  They argue that Hagos litigated a suppression motion based on the faulty affidavit in his drug case, in the murder case, and appealed the denial of his motion to suppress in the murder case.  Respondents also maintain that the exclusionary rule should not apply where, as here, the murder case was the product of Hagos's intervening voluntary acts.

In his reply, Hagos argues that he did not have a full and fair opportunity to litigate his Fourth Amendment claim because the trial court and the CCOA "side-stepped" the constitutional question.  Reply, p. 8.  Moreover, he was never afforded an evidentiary hearing on his motion, only oral argument.  Finally, Hagos reiterates his argument that the CCOA unreasonably applied Supreme Court precedents by creating a new "exception" that contradicts the holding in ***Leon***.  ***Id.*** at pp. 9-10.

In a sense, both parties' arguments miss the mark.  The state courts did not "side-step" Hagos's Fourth Amendment argument entirely; the trial court determined that the prosecution could introduce the evidence seized from 7389 Grant Ranch Boulevard only as *res gestae* of the crimes charged in the murder case.  The trial court explained:

The theory of the People's case is that James Roberts was killed to prevent him from testifying in the Jefferson County case. Therefore the Jefferson County case against Mr. Hagos is a part of the *res gestae* and necessary for the jury's understanding. The jury will need to know enough about the Jefferson County case to put the actions in context. The Court will allow evidence showing that there was such a case and what the charges were in Jefferson County. [ ] The Court will allow brief testimony showing the location searched which disclosed the drugs which were the subject of the case.  All of this material, of course, will be allowed only with an accompanying limiting instruction from the Court explaining that Mr. Hagos is not on trial for that charge and that this evidence is being introduced only to place into context the evidence which is presented in the present trial.

Order of Mar. 13, 2002, p. 4.

Viewed in this light, Hagos's argument that the state court mistakenly side-stepped his constitutional claim lacks merit.  The state court did not view the claim as one grounded in the Fourth Amendment.  Instead it viewed the claim as one touching on a state law issue of admissibility of evidence.  Thus, the question still remains whether the state court improperly admitted the evidence as *res gestae*.

"As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence, and federal courts may not interfere with state evidentiary rulings unless [they] rendered the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." ***Moore v. Marr***, 254 F.3d 1235, 1246 (10th Cir. 2001) (quotations and citations omitted).  When it comes to the admissibility of *res gestae* evidence, the Tenth Circuit has acknowledged it is unaware of any Supreme Court case defining the constitutional parameters of such evidence.  *Velarde v. Reid*, No. 06-1545, 2007 WL 1128871, at *2 (10th Cir. April 17, 2007).  Where the evidence can be "linked in time and circumstances with the charged crime," and could be used to provide the jury "with a full and complete understanding of the events surrounding the

crime[,]" the admission of the evidence as *res gestae* does not render a trial fundamentally unfair.  **People v. Quintana**, 882 P.2d 1366, 1373 (Colo. 1994).

Here the state court's decision to admit the evidence as *res gestae* is reasonable under **Quintana**.  It was linked in time and circumstances with the murder and retaliating against a witness crimes.  The evidence was also necessary for a full and complete understanding of the events surrounding the murder of Roberts.  Moreover, the state court specified the limited basis for discussing the evidence and that a limiting instruction would be provided.  Accordingly, Hagos is not entitled to habeas relief on this claim.

However, even if I were to view this claim as presenting a Fourth Amendment issue, and assuming that Hagos did not have a full and fair hearing in state court on the claim, and further assuming that the affidavit failed to establish probable cause to search the apartment, I would still conclude that Hagos is not entitled to *habeas* relief on this claim.  I disagree with Hagos's suggestion that the affidavit here was "bare bones" rendering the exception to the exclusionary rule inapplicable.  While the affidavit may be lacking in the areas noted by the CCOA, **see Hagos**, 250 P.3d at 619, it is not so "bare bones" or devoid of facts as to render the officers' reliance on it unreasonable under **Leon**.  **Leon**, 468 U.S. at 923 (an officer may not reasonably rely on a warrant where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.).

The eight-page single-spaced affidavit details facts and circumstances occurring eleven months and forty-five, forty, thirty, twenty, and six days before the affidavit was signed.  It also details the factual information supporting the affiant's belief that Roberts

and Hagos were dealing cocaine.  I agree with the CCOA's conclusion that the affidavit presents a chronological account that provides indicia of current drug dealing by Hagos and Roberts.  I further agree with the CCOA that the officer acted in an objectively reasonable manner in submitting, obtaining, and executing the search warrant. Accordingly, the CCOA's determination that the good faith exception applied here was neither contrary to, nor an unreasonable application of, clearly established federal law.  I therefore DENY this claim for habeas relief.

**D.     Claim Three**

In his third claim for relief, Hagos argues that the CCOA's conclusions affirming disqualification of his counsel-of-choice are contrary to clearly established Supreme Court precedent requiring that waivers of counsel be knowing and voluntary. Specifically, Hagos maintains that the CCOA's decision runs afoul of *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) and *Adams v. United states ex rel. McCann*, 317 U.S. 269, 279 (1942).

The Respondents argue that the Supreme Court has only recognized a constitutional right to counsel of choice in the case of retained counsel.  *See* Ans., pp. 49-50 (citing *Powell v. Alabama*, 287 U.S. 45, 53 (1932).  They note that the Supreme Court has indicated in dicta that the Sixth Amendment "right to counsel of choice does not extend to defendants who require counsel to be appointed for them."  *Id.* at 50 (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006)).  Because no clearly established federal law recognizes the right of an indigent defendant to counsel of choice, the Respondents maintain that Hagos's claim must be denied.

"The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts. 'A defendant may not insist on representation by an attorney he cannot afford.'" ***Caplin & Drysdale, Chartered v. United States***, 491 U.S. 617, 624 (1989)(quoting ***Wheat v. United States***, 486 U.S. 153, 159 (1988)). "Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of ... counsel.'" ***Caplin & Drysdale, Chartered***, 491 U.S. at 626.   "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that the defendant will be able to retain the attorney of his choice." ***Id.*** As Respondents correctly note that the right to counsel of choice does not extend to defendants who require counsel to be appointed for them.   ***Gonzalez–Lopez***, 548 U.S. at 151.

Hagos's reliance on ***Adams*** and ***Johnson*** is misplaced.  Those decisions merely hold that a prisoner's waiver of his right to counsel must be knowing and voluntary. Here, however, Hagos did not waive his right to counsel and proceed *pro se* as in ***Adams*** and ***Johnson***.  Rather, he refused to waive a conflict, and the trial court disqualified his counsel of choice and appointed new counsel.  The legal rule that flows from ***Adams*** and ***Johnson*** simply does not address the issue presented by Hagos. Thus, Hagos has not identified any clearly established federal law that the state court violated; thus, his third claim for *habeas* relief must be denied.  ***See House***, 527 F.3d at

1016, 1018 (if no clearly established federal law exists, the district court need not inquire further pursuant to § 2254(d)(1)).

However, even if I assume that Hagos had a constitutional right to counsel of his choice, I would still deny Hagos's request for *habeas* relief on this claim.  While a defendant's right to counsel of choice is not absolute, ***see Wheat***, 486 U.S. at 159, when a trial court unreasonably or arbitrarily interferes with the defendant's right to choose counsel, a conviction attained under such circumstances cannot stand.  ***United States v. Collins***, 920 F.2d 619, 625 (10th Cir. 1990).

I agree with the CCOA's conclusion that the trial court's decision to disqualify Hagos's counsel was neither arbitrary nor unreasonable.  ***Hagos***, 250 P.3d at 610-11.  The trial court concluded that Freyre could be called as a witness by the prosecution and/or Hagos because of his interactions with Patricia Newton.  As a result, the trial court advised Hagos that he must commit to not calling Patricia Newton at trial as a condition of keeping Freyre as his attorney of record.  When Hagos rejected the trial court's offer, the trial court disqualified Freyre due to the very real possibility that he would be called as a witness.  While the trial court's handling of this issue might have been incorrect, it was not arbitrary or unreasonable based on the record before me.  Thus, the CCOA's decision affirming the disqualification of Freyre was not contrary to clearly established Federal law, as determined by the Supreme Court, did not involve an unreasonable application of clearly established Federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, under § 2254(d), no relief is available on Hagos's third claim.

**E.      Claim Four**

Hagos's final claim for relief is a catch-all.  He claims that the cumulative effect of the three constitutional errors addressed above should not be deemed harmless and require *habeas* relief.  I must reject this argument for the same reasons I found no constitutional violations above.  The alleged errors, neither individually nor collectively, rose to the level of having substantial and injurious effect on the jury's verdict.  I must therefore deny this claim for *habeas* relief.

## III. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the **Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** [#1] filed on March 6, 2012, by Petitioner Abraham Hagos is **DENIED**;

2. That this case is **DISMISSED WITH PREJUDICE**; and

3. That there is no basis on which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c).

DATED at Denver, Colorado, February 25, 2013.

**BY THE COURT:**

Robert E. Blackbum
United States District Judge